**Dennis DIGIORE, et al., Plaintiffs,**

v.

**George RYAN, Giacomo A. Pecoraro and Tina Prose, Defendants.**

No. 96 C 1785.

United States District Court, N.D. Illinois, Eastern Division.

Dec. 3, 1997.

Barry Alfred Gomberg, Barry A. Gomberg & Associates, Chicago, IL, Jac A. Cotiguala, Law Offices of Jac A. Cotiguala, Chicago, IL, for Plaintiffs.

Gary Michael Griffin, Cara LeFevour Smith, Illinois Attorney General's Office, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

This case is before us on a second round of dispositive motions, having (partially) survived an earlier motion to dismiss for lack of subject matter jurisdiction. This time, our attention turns to the merits: we must decide whether the plaintiffs, Secretary of State Police Department sergeants and lieutenants, are eligible for overtime pay under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq. The defendants, all Secretary of State officials at various levels move for summary judgment on the ground that plaintiffs are salaried employees exempt from FLSA's requirements.[1] Plaintiffs, however, maintain that summary judgment is inappropriate because they are "subject to" salary deductions that remove the exemption and restore their protection under the Act.[2]

Earlier this year, we dismissed the State of Illinois from this case on Eleventh Amendment immunity grounds, following the Supreme Court's directive in *Seminole Tribe v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). *See Digiore v. State of Illinois*, 962 F.Supp. 1064, 1070–78 (N.D.Ill. 1997). We permitted the case to proceed against the other defendants in their individual capacities. But it ends here. Another recent Supreme Court decision, *Auer v. Robbins*, —— U.S. ——, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997), doom the case on the merits against the remaining defendants. Because we find that, under *Auer*, the plaintiffs are exempt from FLSA's overtime provisions,[3] we grant defendants' motion for summary judgment.[4]

### FACTUAL AND REGULATORY BACKGROUND

The facts, portrayed here in the light most favorable to the plaintiffs, are based on the parties' Local Rule 12(M) and 12(N) submissions and supporting evidentiary materials.[5] The regulations discussed are the Secretary

---

1. Defendants requests summary judgment on all three counts in plaintiffs' complaint Count I alleges a FLSA violation, Count II alleges a wilful violation of FLSA, and Count III is a claim under the Illinois Minimum Wage Law, 820 ILCS 105/1 et seq.

2. Plaintiffs filed motions for partial summary judgment and for judgment on the pleadings on this issue. The motions were denied in open court on October 23, 1997 and November 25, 1997, respectively.

3. This is true with one exception—plaintiff Dennis Serafini. Defendants admit that he is currently on temporary assignment to a non-exempt position. But as we explain below, Serafini's FLSA claim is moot because defendants have agreed to pay him for overtime worked in this position.

4. Granting summary judgment on the FLSA claim strips this Court of jurisdiction over plaintiffs' Illinois Minimum Wage Law claim. The parties' collective Illinois citizenship precludes diversity jurisdiction, and we decline to exercise supplemental jurisdiction over this claim, which plaintiffs did not even attempt to defend in their brief opposing summary judgment.

5. Local General Rules 12(M) and 12(N) of the District Court for the Northern District of Illinois provide that a party moving for summary judgment must submit a statement listing the material facts it believes to be undisputed and which, taken together, entitle it to judgment as a matter of law. The other party must then respond specifically to these allegations and, where it denied that a fact is undisputed, provide references to the record that support a contrary finding. Local Rule 12(N)(3)(a). The non-movant may also submit additional facts, to which the movant must respond. Local Rules 12(N)(3)(b), 12(M). In this case, the defendants submitted a 12(M) statement ("Defs.' Facts"), to which plaintiffs responded ("Pls.' Resp."). Plaintiffs produced a statement of additional facts ("Pls.' Facts"), to which the defendants responded ("Defs.' Resp."). Statements of undisputed fact not denied in accordance with the rule may be deemed admitted if properly supported by references to the record or other evidentiary material. *Stewart v. McGinnis*, 5 F.3d 1031, 1034 (7th Cir.1993). To the extent supported by the record, defendants' facts

of Labor's FLSA interpretations, which we must accord "great weight." *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

Plaintiffs are ten police officers employed by the Secretary of State ("SOS") at the rank of sergeant or lieutenant.[6] Pls.' Facts ¶ 1. Because they are not covered by a union contract, all SOS sergeants and lieutenants are classified as "Merit Compensation" employees. *Id.* ¶ 13. They are paid an annual salary distributed in twice-monthly paychecks, and do not receive overtime compensation for laboring beyond their shifts. *Id.* ¶¶ 14, 103; Defs.' Facts ¶ 5. Nevertheless, the plaintiffs contend that they are entitled to be paid overtime under the FLSA, which requires public employers to pay law enforcement employees overtime when they exceed a certain number of work hours in a 28–day period. 29 U.S.C. § 207(a), (k) (1965 & Supp.1997); 29 C.F.R. § 553.230(c) (1996).

Defendants are SOS officials. George Ryan has served as Illinois Secretary of State since January 1991. Defs.' Facts ¶ 1. That year, he appointed defendants Giacomo Pecoraro and Tina Prose to their respective posts as Director of the Department of Police and Director of Personnel. Pls.' Facts ¶¶ 4, 8. Ryan and Prose remain in their jobs, but Pecoraro left the Director of Police position in 1996. Pls.' Facts ¶¶ 4, 6, 8. Plaintiffs contend that Ryan, Prose and Pecoraro are each responsible in some way for denying them overtime compensation. However, it is undisputed that the SOS office adopted its policy against paying overtime to its police sergeants and lieutenants long before any of the defendants took office.[7] Defs.' Facts ¶ 5.

FLSA sets the federal standards for overtime compensation.[8] Its overtime require-

ments do not apply, however, to employees serving in a "bona fide executive, administrative or professional capacity." 29 U.S.C. § 213(a)(1). Defendants have the burden of proving that plaintiffs fall into one of these "exempt" categories, and the exemptions are to be narrowly construed. *Bankston v. Illinois*, 60 F.3d 1249, 1252 (7th Cir.1995). At issue in this case is the bona fide executive exemption, which has both "salary" and "duties" components. Among them are conditions that are "executive" employee earn at least $250 per week on a "salary basis" and supervise two or more employees. 29 C.F.R. § 541.1(f). The parties do not question that the plaintiffs earn the requisite amount or, with the exception of Sergeant Serafini,[9] satisfy the duties test. What they dispute is whether plaintiffs are paid on a "salary basis," a term not applicable to employees whose pay is "subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.118(a).

Plaintiffs claim that the defendants' policies and practices subject them to salary deductions through suspensions without pay. Permissible and prohibited suspensions are separated by a thin regulatory line: suspensions without pay for periods of less than a full work week remove the executive exemption, but suspensions in work-week increments do not. *Id.* 541.118(a) ("This policy is also subject to the general rule that an employee need not be paid for any workweek in which he performs no work."); *Childers v. City of Eugene*, 120 F.3d 944, 945 n. 1 (9th Cir.1997) (interpreting this language to mean that full-week suspensions are consistent with § 118(a)'s prohibition against salary reduction); Brief for the Department of Labor as *Amicus Curiae* at 6–7, *Auer v. Robbins*,

---

and plaintiffs' additional facts are therefore taken as admitted.

**6.** They are: Sergeant Dennis Digiore, Sergeant Robert Dufkis, Lieutenant Ken Easterly, Sergeant Joe Gabuzzi, Lieutenant William Johns, Sergeant Michael Juliano, Sergeant James Kazimour, Sergeant Dennis Serafini, Sergeant Marian Vrtik and Lieutenant Bradley Warren.

**7.** Because we grant summary judgment on the ground that plaintiffs are exempt from FLSA's overtime requirements, we need to address whether any of the defendants was sufficiently

involved in implementing or continuing the SOS overtime policy to be held personally liable.

**8.** Initially, FLSA did not apply to public employees. Congress's 1974 decision to extend FLSA to the public sector was challenged on Tenth Amendment grounds, but the Supreme Court rejected this attack and upheld FLSA's governmental application. *See Garcia v. San Antonio Metropolitan Transit Auth.*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985).

**9.** Sergeant Serafini's situation is unique; we deal with it separately in the analysis.

—— U.S. ——, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) ("[A]n otherwise salaried employee who is suspended without pay for one full week … would remain a salaried employee.") [hereinafter "DOL Brief"]. Plaintiffs point to three SOS policies with allegedly offending disciplinary provisions: the Police Department's Accident Policy, its Physical Fitness Policy, and the SOS's pre–1993 Progressive Disciplinary Policy.

The Police Department has had its own Accident Policy since August 1990 to "establish[] policy and procedure for the review of vehicle accidents to ensure the protection of the public and the investigators in matters of traffic safety." Pls.' Dep.Ex. 3, at 1. The policy applies to all "sworn personnel," that is, SOS police officers of all ranks. Id.; Pls. Facts ¶ 28. Under the policy, sworn personnel may be disciplined for "chargeable accidents." Pls.' Dep.Ex. 3, at 2. The penalties range from one to three days' suspension without pay or uncompensated time for the first chargeable accident; from two to five days' suspension without pay or uncompensated time or the second; and from three to ten days' suspension without pay or uncompensated time for chargeable accidents beyond the second. Id. These penalties are not mandatory; they are simply laid out as a "schedule of suggested penalties" that an administrative body, the Accident Review Board, "may recommend to the Director [of Police] for chargeable accidents." Id. The breadth of the Director's direction is somewhat unclear, though, because this language is qualified by the statement that the "Director shall not be bound by this schedule in those cases involving gross negligence or complete disregard of traffic laws and safe driving practices." Id.

During a period when Pecoraro was absent in 1991, two plaintiffs and another sergeant (not participating in this litigation) were disciplined under this policy. Defs.' Reply Ex. D. For their involvement with chargeable traffic accidents, Sergeants Digiore, Johns

and Manning were given the option of taking a one-day suspension or working an uncompensated shift. Pls.' Facts ¶¶ 45–47; Defs.' Resp. ¶ 47. All chose to work. Defs.' Facts ¶¶ 8, 12; Pls.' Facts ¶ 47. A lieutenant, Raymond Wood, was issued a suspension at the same time, but he retired before the suspension took effect. Pls.' Facts ¶ 49; Defs.' Resp. ¶ 49. No sergeant or lieutenant has suffered a partial-week suspension for violating this policy since. Nor is there evidence that these individuals were suspended at any other time.

The Police Department Accident Policy is not the sole source of disciplinary suspensions. Issued on June 7, 1992 and in force until October 21, 1996, the Police Department's Physical Fitness Policy allowed unpaid suspensions as well. Pls.' Facts ¶ 51. Like the Accident Policy, it applied to all sworn personnel. Pls.' Dep.Ex. 4 art. I. The Fitness Policy's disciplinary section stated that "[p]rogressive discipline may be applied to those sworn personnel who do not meet the standards set forth for the physical fitness test." Id. art. IX. Officers could receive a verbal warning, a written warning or a suspension, listed as "steps" in the process but not tied to any particular action other than failure to meet the test's "standards." Id. § A. In other words, while the steps increased in severity, they did not specify what type of violation warranted what level of discipline—the policy required only 75 days between steps. Suspensions, when imposed, were administered in four "processes"—two-day, five-day, ten-day and twelve-day increments. Id. § E. Again although procedurally meticulous, the suspension process did not explain under what substantive circumstances it would apply. There is no evidence that any SOS police officer at the rank of sergeant or higher has ever been suspended without pay under the Physical Fitness Policy.[10]

The SOS also has a general, office-wide Progressive Disciplinary Policy, a set of cor-

---

10. Plaintiffs make the irrelevant point that before plaintiff Marian Vrtik was promoted to Sergeant (and held the rank of Investigator), he was suspended for a day in 1985 for failing physical fitness requirements. Pls.' Facts ¶ 54. This has no bearing on our exemption analysis because the parties agree that Investigators are hourly employees who are not exempt from FLSA's overtime provisions. Nor does the fact that Vrtik received a verbal warning for violating the same policy when he was a lieutenant, see Pls.' Facts ¶ 122; verbal warnings do not eviscerate the FLSA exemption.

rective procedures for misconduct contained in the SOS policy manual covering all employees. The Progressive Disciplinary Policy was amended in 1993 to clarify that SOS Merit Compensation employees, which include plaintiffs, can be suspended in only five-day or equivalent work-week increments. Pls.' Dep.Ex. 22; Prose Dep. at 36, 53–55; Patton Dep. at 124; Rolando Dep. at 21. Defendant Tina Prose, the Personnel Director, testified that the Merit Compensation Progressive Discipline Policy supersedes any other disciplinary policies that ostensibly permit suspending Merit Compensation employees for less than five days—including the Police Department's Accident and Physical Fitness policies—but the SOS policy manual does not state this explicitly. Prose Dep. at 36, 53–55.

The testimony from SOS officials was that the 1993 Merit Compensation disciplinary provisions were added to reflect existing disciplinary practice. Before 1993, the SOS Progressive Disciplinary Policy did not distinguish between Merit Compensation and non-Merit Compensation employees, and had provisions for partial-week suspensions. Pls.' Facts ¶ 19. But according to Prose SOS office practice since 1990 was to suspend Merit Compensation employees only for five-day periods—the 1993 Merit Compensation employee provision was added simply to memorialize this practice. Prose Dep. at 136–37. The Chief Labor Negotiator for the SOS, William Rolando, agreed with Prose's assessment. Rolando Dep. at 21. He assisted in drafting the 1993 Policy revisions, see Pls.' Facts ¶ 21, and testified that as the standards for disciplining exempt employees became clearer following the Supreme Court's 1985 decision upholding FLSA's application to the public sector,[11] the SOS policy revisors "decided that we should bring our policy manual at least into compliance with what the working actions of the office were," i.e., limiting exempt employee suspensions to full work week. Rolando Dep. at 20–21.1

Even before 1993, the SOS had a mechanism for ensuring that employee suspensions comport with FLSA—the Technical Services Division ("TSD") of the Personnel Department. The TSD reviews personnel actions for FLSA compliance, Pls.' Facts ¶ 69; Patton Dep. at 124; Prose Dep. at 19–25. The suspension procedure begins, for SOS police officers, with the Director of Police's (Pecoraro until 1996) recommendation. Pls.' Facts ¶ 57. The Personnel Department, through Prose, has the power to approve or deny his recommendation. After a bi-level FLSA compliance review in Technical Services, the Personnel Department may exercise its power to reject the recommendation if it would violate FLSA. Pls.' Facts ¶¶ 67–72. For example, Prose testified that in 1993 or 1994 Pecoraro recommended partial-week suspensions for two officers above the rank of Investigator. Pls.' Facts ¶ 68. But Prose refused to process the suspensions because they did not comply with FLSA. Prose Dep. at 139.

As mentioned above, notwithstanding this review process four sergeants were issued unpaid suspensions during Pecoraro's absence in 1991 for violating the Police Department's Accident Policy. And in 1990, when plaintiff Michael Juliano was still a sergeant, he was suspended without pay. Although his suspension period was five days, it spanned two work weeks—Wednesday, January 17 through Tuesday, January 23. Pls.' Facts ¶¶ 60–62. Asked whether this type of split-week suspension could be imposed under the 1993 Merit Compensation Progressive Discipline Policy, Pecoraro "conjecture[d]" that it could, although no split-week suspension has been issued since Juliano's in 1990. Pecoraro Dep. at 78. These are the five suspensions on which plaintiffs rest their case. The remaining seven plaintiffs are not alleged to have been suspended without pay during the relevant time period, which the parties appear to agree began in 1990 at the earliest.[12] Dufkis Dep. at 41.

---

11. *See Garcia v. San Antonio Metropolitan Transit Auth.*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985).

12. During Dufkis' deposition, plaintiffs' attorney specified that the "relevant time period" for sus-

pensions affecting exempt status was 1990 or later. Dufkis Dep. at 40–41. We cannot ascertain the basis for this statement, but perhaps it correlates with the date the current Accident Policy was issued.

Based on these suspensions and the disciplinary provisions in the Police Department Fitness and Accident policies—which remain in effect despite their apparent conflict with the Merit Compensation Progressive Discipline provisions—plaintiffs argue that their FLSA exemption has been destroyed because their salaries are subject to reduction based on the quality or quantity of their work. Defendants counter that, under *Auer*, the policies' nominal application to Merit Compensation employees is insufficient to defeat their FLSA exemptions, especially in light of office practice limiting Merit Compensation employee suspensions to full work weeks and the 1993 SOS policy manual amendments memorializing this practice. Defendants likewise dismiss the five 1990–1991 suspensions as too insignificant and far removed to eliminate the FLSA exemption for an entire class of employees. They rely in part upon the FLSA regulations' "window of correction," which, under certain circumstances, preserves an employee's FLSA exemption despite an improper deduction. The remainder of our opinion is dedicated to settling these issues.

## SUMMARY JUDGMENT STANDARDS

Summary judgment is proper when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir.1994). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court must view all evidence in a light most favorable to the nonmoving party, and draw all reasonable inferences from the evidence in the nonmovant's favor. *Cincinnati Ins.*, 40 F.3d at 150. But if the evidence is merely colorable, or is not significantly probative, or just raises "some metaphysical doubt as to the material fact," summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 261, 106 S.Ct. at 2516; *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In making its determination, the court's sole function is to determine whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for summary judgment. *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. at 2513–14.

## ANALYSIS

### I. SOS Policies Do Not Create a Significant Likelihood That Sergeants and Lieutenants Will Be Disciplined With Salary Deductions

As discussed above, an employee is exempt form FLSA's overtime requirements only if his pay "is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.118(a). This year, the Supreme Court clarified the standard for determining whether an otherwise salaried employee's pay is "subject to reduction"; the employee must be covered by a policy that "permits disciplinary or other deductions in pay 'as a practical matter.'" *Auer v. Robbins*, 519 U.S. 452, ——, 117 S.Ct. 905, 910, 137 L.Ed.2d 79 (1997) (quoting DOL brief). The policy allowing deductions must be "clear and particularized," and must "effectively communicate[] that deductions will be made in specified circumstances." *Id.* (internal quotations omitted). Deferring to the Secretary of Labor's regulatory interpretation, the Court endorsed a two-part test to ascertain whether a policy meets this standard: either 1) the employer's policy creates a significant likelihood of impermissible deductions, or 2) the employer has an actual practice of making such deductions. *Id.* at ——, 117 S.Ct. at 911; *see Haywood v. North American Van Lines, Inc.*, 121 F.3d 1066, 1069 (7th Cir.1997).

The *Auer* plaintiffs were St. Louis Police Department sergeants and lieutenants who used for overtime pay under FLSA. They argued that the Police Department Policy Manual removed their executive exemption because its provisions permitting monetary discipline nominally applied to all department employees, not just officers below the rank of sergeant, theoretically exposing plaintiffs to the possibility of deductions. *Id.* at ——, 117

S.Ct. at 910. As proof, the plaintiffs pointed to the one and only time the Department punished a sergeant under the policy with a deduction in pay. The Court rejected plaintiffs' "theoretical possibility" approach in favor of a more stringent "significant likelihood" standard. *Id.* at ——. 117 S.Ct. at 911. Examining the Department's Policy, the Court held that it did not create a significant likelihood that deductions would be assessed against salaried employees such as plaintiffs because the policy's disciplinary provisions applied to both salaried and non-salaried employees alike. *Id.* As such, "the expressed availability of disciplinary sanctions may have reference only to the latter." *Id.* The Court rested its decision on the fact that "it is perfectly possible to give full effect to every aspect of the manual without drawing any inference" that salaried employees would be punished with pay deductions. *Id.* As for the singular instance of sergeant pay-docking, the Court dismissed it as a "one-time deduction ... under unusual circumstances." *Id.* at ——, 117 S.Ct. at 912.

With these pronouncements, the Court implicitly overruled caselaw in several circuits finding the "subject to reduction" component met if a policy merely presents the possibility of reducing a salaried employee's pay. *See, e.g., Bankston v. Illinois,* 60 F.3d 1249, 1253 (7th Cir.1995) (denying summary judgment on exemption grounds because salaried officers "may be suspended" without pay under an employment policy); *Abshire v. County of Kern,* 908 F.2d 483, 485 (9th Cir.1990) (employment policy with provisions for partial-week pay deductions destroyed exemption because it nominally covered salaried employees). All the post-*Auer* cases have followed suit, holding that in the absence of explicit language applying disciplinary deductions to salaried employees, those employees are not significantly likely to be punished with monetary discipline. *See Childers v. City of Eugene,* 120 F.3d 944, 947 (9th Cir. 1997) (no significant likelihood of deductions where policy "did not explicitly provide that exempt employees were subject to disciplinary deductions in pay"); *Stanley v. City of Tracy,* 120 F.3d 179, 184 (9th Cir.1997) (same); *Ahern v. County of Nassau,* 118 F.3d 118, 122 (2d Cir.1997) (even where policy applied specifically to exempt employees,

policy failed significant likelihood test because plaintiffs "could not point to any rule that stated that if they committed a specific infraction their pay would be docket"); *Carpenter v. City & County of Denver, Colo.,* 115 F.3d 765, 766–67 (10th Cir.1997) ("[T]he City Charter applies to all members of the classified service, and, thus, does not 'effectively communicate' that the statement of available penalties applies only to plaintiffs"); *Balgowan v. State of New Jersey,* 115 F.3d 214, 219 (3d Cir.1997) (disciplinary policy that applies to all employees "fails to 'effectively communicate that pay deductions are an anticipated form of punishment' " for employees in plaintiffs' class) (quoting *Auer* ).

The SOS Police Department Accident and Fitness policies, the two policies that plaintiffs claim subject them to pay deductions, likewise do not affect their exempt status because each applies to all SOS sworn personnel, both salaried and non-salaried. Furthermore, neither policy requires a partial-week suspension without pay for a specific infraction. *See Ahern,* 118 F.3d at 121 (although policy explicitly permitted deductions for high-ranking, salaried employees, significant likelihood test not met because nothing "stated that if they committed a specific infraction, their pay would be docked"). Under *Auer,* then, these policies do not make the danger of impermissible deductions for sergeants and lieutenants "significantly likely."

For example, the Accident Policy covers all sworn employees and permits partial-week suspensions for all levels of chargeable traffic accidents. But it leaves the actual punishment to the Director of Police's discretion—the policy characterizes the penalties as "suggested" disciplinary measures that the Accident Review Board "may recommend" to the Director. Issuing full-week suspensions to sergeants and lieutenants is perfectly consistent with these discretionary terms. Although the policy's subsequent statement that the Director "shall not be bound by this schedule in those cases involving gross negligence or complete disregard of traffic laws and safe driving practices" appears to limit the Director's discretion in other cases, the policy never explains to what extent the

schedule is mandatory in other cases. Consequently, the Accident Policy does not permit a clear inference that sergeants or lieutenants will receive partial-week suspensions without pay "in specified circumstances." *Auer*, 519 U.S. at ——, 117 S.Ct. at 911.

The Fitness Policy, broadly worded like the Accident Policy to cover all sworn personnel regardless of salary status, also fails to tie partial-week suspensions without pay to certain actions by sergeants and lieutenants. It states only that progressive discipline "may be applied" to sworn personnel who do not meet the fitness test standards. Progressive discipline, in turn, is comprised of "steps" that begin with a verbal warning and end with suspensions. Although partial-week suspensions without pay are possible sanctions, the policy neither requires them for sergeants and lieutenants nor mandates them for a particular violation, either in number or severity. Again, the policy provisions on partial-week suspensions without pay could easily refer only to test failures on the part of lower-ranked officers. The fact that no police officer at the rank of sergeant or higher has ever been suspended without pay under this policy is additional proof that it is not "significantly likely" to be invoked against those employees.

The plaintiffs' position is even weaker in light of the SOS's compliance review process and the 1993 Merit Compensation Progressive Disciplinary Policy. Both reduce even further the likelihood that SOS sergeants and lieutenants will receive improper partial-week suspensions. The Merit Compensation Policy applies to employees at plaintiffs' rank, and requires suspensions without pay for those employees to be imposed in workweek increments—which is consistent with FLSA. Although the Accident and Fitness policies' disciplinary provisions remain in effect, Director of Personnel Prose testified that the Merit Compensation Policy's full-week constraint supersedes any other policy's contrary disciplinary provisions. Prose, who retains ultimate authority for approving suspensions, related an instance in which she refused to process partial-week suspensions recommended by Police Director Pecoraro for this very reason. Moreover, Prose testified that even before 1993 office practice was to suspend Merit Compensation employees

only for full work weeks—a practice enforced by FLSA compliance review in the Personnel Department's Technical Services Division. Her testimony was corroborated by SOS Chief Labor negotiator William Rolando, who assisted in drafting the 1993 Merit Employee Progressive Discipline policy, and explained that it simply memorialized the existing practice of confining Merit Compensation employee suspensions to full weeks.

Faced with very similar facts, post-*Auer* decisions have reached the same result as we do. In *Stanley v. City of Tracy*, 120 F.3d 179 (9th Cir.1997), plaintiffs contested their exempt status based on City policies providing for partial-week disciplinary suspensions without pay. The court rebuffed the plaintiffs' interpretation, finding no significant likelihood that they would receive such discipline because the policies applied, as in *Auer*, to both salaried and non-salaried employees. *Id.* at 184. Of special importance was the fact that the City had in place FLSA compliance review procedures that subjected all disciplinary suspensions to the scrutiny of legal counsel or the Personnel Advisory Board. *Id.* In addition, the City had recently become aware that FLSA required full-week suspensions for exempt employees. *Id.* "With this awareness on the part of the City, and with the City's practice of reviewing all suspensions for statutory compliance before implementation, it is not 'significantly likely' that salaried personnel would ever have been subject to a suspension inconsistent with their salaried status." *Id.* Along the same lines, the court in *Ahern v. County of Nassau*, 118 F.3d 118, 120 (2d Cir.1997), relied on the defendant Police Commissioner's statement that his "general practice was not to impose fines" on salaried employees. We lend the same credence to the SOS's compliance review process and SOS officials' testimony about general office practice.

■ Besides pointing to the five 1990–1991 suspensions in this case (whose effect we address next under the "actual practice" prong of the *Auer* test), plaintiffs offer little to support their argument that the two Police Department policies create a significant likelihood of improper discipline. They cite no legal authority for their position, other than

the Seventh Circuit's decision in *Bankston v. Illinois*, 60 F.3d 1249 (7th Cir.1995), which applied the theoretical possibility standard rejected in *Auer*. Nor do they present evidence that contradicts the defendants' testimony regarding compliance review and office practice. Instead, plaintiffs resort to arguing that the *Auer* test requires a factual inquiry inappropriate for summary judgment. But this argument fails because several courts have granted summary judgment using the *Auer* test, making it clear that whether a policy presents a significant likelihood of monetary discipline for a particular class of employees is a legal issue ripe at the summary judgment stage. *See Balgowan v. State of New Jersey*, 115 F.3d 214 (3d Cir. 1997); *Childers v. City of Eugene*, 120 F.3d 944 (9th Cir.1997); *Carpenter v. City & County of Denver, Colo.*, 115 F.3d 765 (10th Cir.1997). In the absence of opposing authority or proof, we find that the defendants have met their burden of proving that the Accident and Fitness policies do not destroy the plaintiffs' exempt status under the first prong of the *Auer* test.

## II. Plaintiffs Cannot Show an Actual Practice of Disciplinary Deductions Based on the Five Suspensions in This Case

An actual practice of suspending sergeants and lieutenants without pay for less than a week would still prevent summary judgment. *See Auer*, 519 U.S. at ——, 117 S.Ct. at 911. Plaintiffs claim that the four 1991 partial work-week suspensions of SOS sergeants under the Accident Policy, as well as Juliano's 1990 suspension spanning two partial work weeks, establish an actual practice of deductions sufficient to remove the FLSA exemption from the entire class of SOS sergeants and lieutenants. Defendants respond that none of the four 1991 suspensions actually resulted in pay deductions because all the sergeants chose to work an extra day instead. They also point out that Juliano's suspension lasted five days; they consider the split work week irrelevant. We need not reach the defendants' arguments, however,

because we find that 1) the five isolated partial-week suspensions in this case do not amount to an "actual practice" eviscerating all high-ranking officers' exemptions, and 2) the defendants have preserved these employees' exempt status in any event complying with the DOL regulations' "window of correction."

■ The regulations provide that if a deduction is made under circumstances indicating that "there was no intention to pay the employee on a salary basis," then the exemption is "[not] applicable to him during the entire period when such deductions were being made." 29 C.F.R. § 541.118(a)(6). The effect of any improper deduction "will depend upon the facts in the particular case." *Id.* In its brief to the Supreme Court in *Auer*, the Secretary of Labor elaborated on this language,[13] explaining that the most important "fact" is frequency:

> On the one hand, for example, when there is evidence that improper deductions have been taken with some frequency for violations of a work rule by employees having a particular rank, it is fair to conclude that all employees in that rank are "subject to" such deductions. On the other hand, when such deductions have not occurred or have only occurred in idiosyncratic or unusual circumstances, that conclusion generally would not be warranted.

DOL Brief at 22. *Auer* made clear that a one-time deduction in a salaried employee's pay does not affect exempt status. 519 U.S. at ——, 117 S.Ct. at 912; *see also Childers v. City of Eugene*, 120 F.3d 944, 947 (9th Cir. 1997) ("[T]he district court did not err in determining that Appellants were rendered nonexempt by the City's one-time imposition of a disciplinary suspension on an exempt employee...."). The Tenth Circuit recently held that even two deductions were insufficient to destroy the exemption. *Carpenter v. City & County of Denver, Colo.*, 115 F.3d 765, 767 (10th Cir.1997). What these cases leave open is where courts are to draw the line between "frequent" deductions and de-

---

13. The *Auer* Court emphasized that the Secretary's regulatory interpretations deserved no less deference because there were articulated in a brief. 519 U.S. at ——, 117 S.Ct. at 912. The interpretations were not "post hoc rationalizatio[ns]"; rather, they "reflect[ed] the agency's fair and considered judgment on the matter in question." *Id.* (internal quotations omitted).

ductions made in "idiosyncratic or unusual circumstances."

Considering all the facts in this case, we conclude that the five 1990–1991 suspensions fall on the "idiosyncratic" as opposed to the "frequent" side of the line; as such, they do not establish an actual practice of impermissible deductions. First, we note that the record shows no partial-week suspensions issued to sergeants or lieutenants in the past five years. This is consistent with the defendants' unrebutted testimony that SOS general practice is to limit suspensions for these officers to full work weeks. Both the record and this testimony comport with the Technical Service Division's compliance review procedures and the 1993 Merit Compensation Disciplinary Policy, which limit Merit Compensation employee suspensions to full weeks. Consequently, SOS office practice, as well as express policy since 1993, manifest an intent to classify sergeants and lieutenants as exempt—an intent sufficient to overcome the allegedly improper deductions in five early isolated instances.

Second, a look at the suspensions themselves reveals that they were issued under unusual circumstances. Juliano's suspension was imposed in 1990—before any of the defendants took office. Named in their individual, not official, capacities, these defendants do not automatically inherit the intentions of their predecessors. The four 1991 suspensions were also idiosyncratic in that they were issued in defendant Pecoraro's absence (normally, suspensions must be approved by both Prose and Pecoraro) and occurred very early in the defendants' term. As Rolando testified, once caselaw clarified FLSA exemption requirements, office practice and policy conformed to those requirements. For these reasons, we cannot say that defendants engaged in an actual practice of suspending exempt employees for partial work weeks.

■ Even if we were to find that the five suspensions constituted an actual practice of improper deductions, plaintiffs' exempt status would still have been preserved through defendants' compliance with the "window of correction." The window of correction refers to 29 C.F.R. § 541.118(a)(6), which provides that "where a deduction not permitted by these interpretations is inadvertent, or is made for reasons other than lack of work, the exemption will not be considered to have been lost if the employer reimburses the employee for such deductions and promises to comply in the future." *Auer* interpreted this language to mean that an employer may dock a salaried employee's pay for disciplinary reasons without losing the exemption provided that, at some point, the employer reimburses the employee and pledges not to do it again. 519 U.S. at ——, 117 S.Ct. at 912. The deduction need not have been unintentional, because the regulation sets out "inadvertence" and "for reasons other than lack of work" as two legitimate alternative reasons for making the deduction. *Id.* Nor must the employee be reimbursed within a particular time frame as the regulation is silent on this point. *Id.*; *see Arrington v. City of Macon,* 973 F.Supp. 1467, 1474 (M.D.Ga.1997) (employer may preserve exempt status even after suit filed). Indeed, the *Auer* Court allowed the employer to take advantage of the window of correction even though he had not made efforts to do so by the time the Supreme Court considered the case. *Id.*

There are some barriers, however, to the window's availability. The Secretary of Labor's position is that an employer cannot reap the window's benefits if it has a "settled policy of making improper deductions." DOL Brief at 28. As with the "actual practice" criterion, the Secretary established two extremes:

Where a one-time disciplinary deduction is made, the exemption will not be considered to have been lost in all workweeks if the employer reimburses the employee for such deduction and agrees to not take any such impermissible deduction in the future. Where disciplinary deductions not permitted by the Regulations occur on a regular and recurring basis (e.g., because of an employer's policy), we would question whether such employees, including all of those in the "class" or "category" of employees affected by such deductions, are actually paid on a salary basis and the exemption may be denied in all workweeks.

*Salary Basis*, Wage & Hour Manual (BNA) 99:5257 (Dec. 24, 1991). Although the Seventh Circuit has not addressed the circumstances under which employers may use the window, other circuits have split on whether it is available to an employer with a longstanding policy permitting improper deductions. *See Hoffmann v. Sbarro*, 982 F.Supp. 249, 255–57 (S.D.N.Y. 1997) (discussing circuit split). Fortunately, we need not choose sides; the suspensions in this case were clearly not issued on a regular and recurring basis. Even if five suspensions constitute an actual practice, they do not add up to a longstanding policy. *See Davis v. City of Hollywood*, 120 F.3d 1178, 1180 (11th Cir. 1997) (four salaried employees' partial-week suspensions without pay did not prevent defendants from using window of correction to preserve exemption). Defendants are therefore entitled to rely on the window of correction.

And they have complied with the window's requirements to the letter. First, all five suspensions were issued for reasons other than lack of available work; their purpose was to discipline the employees. Second, defendants more than satisfied *Auer's* requisites for reimbursement. They have provided this Court with an affidavit from Robert Powers, Assistant SOS Counsel, testifying that the five suspended employees, Easterly, Johns, Digiore, Manning and Juliano, are "now being compensated for any days lost not in accordance with the Fair Labor Standards Act (29 C.F.R. § 541.118(a)(6)) and the Secretary of State's Personnel Manual." Defs. Reply Ex. C ¶ 4. As proof of reimbursement, defendants attach copies of letters that Prose wrote to these individuals explaining that they will receive paid leave time to compensate for their suspensions. *Id.* Ex.D. Plaintiffs have given us no reason to question the veracity or accuracy of these letters.

The defendants also meet the window's remaining criterion that they "promise[] to comply in the future." Under the 1993 Merit Compensation Disciplinary Policy, sergeants and lieutenants (as Merit Compensation employees) can be suspended in only work-week

increments. This policy overrides all other contrary disciplinary provisions. By amending SOS policy to mirror FLSA's exemption standards, SOS officials have explicitly promised future compliance. *See Childers*, 120 F.3d at 947 ("In this case, the City has ... made every effort to comply with FLSA's requirements, including adopting a disciplinary policy forbidding the suspension of any exempt employee for a period of less than one week."). Under quite similar circumstances, another court held that such a policy protected the exempt status of all salaried employees:

> The summary judgment evidence indicates that the impetus for the City's decision to modify its personnel regulations on October 9, 1990, was to clarify the City's policy that the pay of its exempt employees would not be subject to deductions for absences of less than a day[14] and to ensure that the City complied with FLSA. The City took these curative steps in expressly amending its personnel regulations and in reimbursing its employees in order to preserve the exempt status of all its exempt employees, including the plaintiffs, pursuant to the provisions in 29 C.F.R. § 541.118(a)(6).

*Simmons v. City of Fort Worth, Tex.*, 805 F.Supp. 419, 425 (N.D.Tex.1992). The SOS sergeants and lieutenants' exempt status has likewise been preserved.

### III. Plaintiff Serafini's FLSA Claim is Moot

■ One issue remains for our resolution—Plaintiff Serafini's FLSA status. To be an exempt executive, an employee must not only satisfy the salary basis test, he must also meet a supervisory requirement, namely supervising two or more employees at all times. 29 C.F.R. § 541.119. Since April 1997, Sergeant Serafini has been temporarily assigned to a task force for the Secret Service in a position that does not involve supervising any other employees. Pls.' Facts ¶ 83. Although this unquestionably destroys his exemption, Serafini's request for overtime payment for work in this position was origi-

---

**14.** Another prerequisite to exempt status, not at issue in this case, is that the employer may not dock pay for fractions of a day that the employee takes off from work for personal reasons or sickness. *Id.* at 424.

nally denied. *Id.* ¶ 108. Recognizing that the denial was improper, the defendants have since agreed to pay him overtime while he remains in this position. Defs.' Reply Ex. C ¶ 5. The defendants have also requested that Serafini submit a list of overtime hours worked from the date he began this temporary assignment, promising that Serafini "will be paid for verifiable overtime hours in accordance with FLSA." Defs.' Reply Ex. C ¶ 5.

Sergeant Serafini's overtime claim is no longer viable because defendants have agreed to pay him overtime for past, present and future hours worked in this non-exempt position. Outside this temporary assignment, plaintiffs do not allege that Serafini's status differs from the rest of his peers. As such, any claim Serafini has for overtime beyond this temporary assignment fails based on our exemption ruling.

## CONCLUSION

The above analysis shows that the defendants have met their burden of proving that plaintiffs are exempt from FLSA's requirements. SOS policy does not present a substantial likelihood of improper suspensions, nor do defendants have an actual practice of suspending salaried employees for partial work weeks. Defendants have, in any event, cured the effect of any impermissible suspensions through the window of correction. Accordingly, we grant summary judgment on plaintiffs' FLSA claims.[15]

The Court hereby enters the following rulings. Summary judgment is granted to the defendants on Counts I and II, the plaintiffs' two FLSA claims. We decline to exercise supplemental jurisdiction over Count III, plaintiffs' IMWL claim, which they do not attempt to defend against summary judgment. Count III is therefore dismissed without prejudice to its refiling in state court. Plaintiffs' motion for judgment on the pleadings is denied. The Clerk of the Court is

directed to enter judgment for the defendants pursuant to Fed.R.Civ.P. 58.

---

**15.** Because we find that plaintiffs are not covered by FLSA, whether defendants willfully violate FLSA (Count II) is moot.